# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

**DAMION G.V. DAVIS,**

                *Petitioner,*

    **v.**

**MERRICK GARLAND,**
    **in his official capacity as Attorney**
    **General, U.S. Department of Justice;**

**ALEJANDRO MAYORKAS,**
    **in his official capacity as Secretary,**
    **U.S. Department of Homeland**
    **Security;**

**THOMAS BROPHY,**
    **in his official capacity as Acting Field**
    **Office Director, Buffalo Field Office,**
    **Enforcement Removal Operations,**
    **Immigration and Customs Enforcement;**
    **U.S. Department of Homeland Security;**

**JEFFREY SEARLS**
    **in his official capacity as Officer-in**
    **Charge, Buffalo Federal Detention**
    **Facility.**

                *Respondents.*

**Civil Action No.: <u>1:22-cv-00443-LJV</u>**

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1

## INTRODUCTION

1.      Damion G.V. Davis, ("Petitioner" or "Mr. Davis") is a forty-three-year-old native of Jamaica.  From his birth until the age of eleven, Mr. Davis lived continuously with his biological father, Delroy Davis, and mother, Dorothy Williams, in Jamaica.  *See* ECF No. 11-2, Sworn Statement of Dorothy Williams ("Williams Statement").  Mr. Davis's parents remained together from 1976 until 1982.  *Id.*  In 1982, Mr. Davis's father came to the United States and ended his relationship with Mr. Davis's mother.  *Id.*

2.      On November 2, 1989, Mr. Davis was admitted into the United States as a lawful permanent resident ("LPR").  Since his lawful entry into the United States, Mr. Davis has never returned to Jamaica.  In the United States, Mr. Davis primarily resided with his father in New York City.  Mr. Davis's father became a naturalized United States citizen on or about November 23, 1994, prior to Mr. Davis's eighteenth birthday.

3.      On October 17, 2019, Mr. Davis was taken into civil immigration custody by the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") (collectively, "the government") from his home in Carlisle, Pennsylvania.  *See* ECF No. 11-1, Decl. of Damion G.V. Davis ("Davis Decl.") ¶ 2.  ICE officers entered Mr. Davis's house without providing proof of any warrants for Mr. Davis's immigration arrest or any notices Mr. Davis was being charged with removal from the United States.  *See id*. ¶¶ 5-6.  Following the arrest, Mr. Davis was first brought to a local ICE headquarters office, where ICE officers took Mr. Davis's fingerprints, and then brought to the York County Prison ("York CP"), in York, Pennsylvania.  *See id*. ¶¶ 7-8.

4.      On October 23 and October 24, 2019, Mr. Davis was interviewed by ICE officer David MacPherson ("Officer MacPherson") at the York CP.  *See id*. ¶¶ 9-10.  Officer MacPherson

told Mr. Davis he was removable from the country and asked him questions relating to his and his family's immigration history.  *See id*.  In the evening of October 24, 2019, ICE issued Mr. Davis a Notice to Appear ("NTA"), initiating Mr. Davis's removal proceedings.  *See id*. at 13.

5.    Mr. Davis remained detained at York CP for approximately fourteen months, where he proceeded through removal proceedings.  He was thereafter transferred by ICE to the Pike County Correctional Facility ("Pike CCF"), in Hawley, Pennsylvania.  Mr. Davis was detained at the Pike CCF for approximately sixteen months.  In May 2022, Mr. Davis was transferred by ICE to the Buffalo Federal Detention Facility ("Buffalo FDF") in Batavia, New York, where he currently remains detained.

6.    In immigration proceedings, the DHS charged Mr. Davis with removal from the country based on certain of Mr. Davis's past criminal convictions.  Appearing before the Immigration Judge *pro se*, Mr. Davis primarily contested his charges of removability on the grounds that he derived United States citizenship through his father and, in the alternative, was eligible for relief based upon a fear of persecution and torture in Jamaica.  The Immigration Judge denied all of Mr. Davis's challenges and entered an order of removal on February 21, 2020.  *See* ECF No. 11-3, Dec. and Orders of the Immigr. Judge, *In re Damion Glenroy Vardo Davis*, No. A042-256-487 ("*In re Davis*") (Immigr. Ct. York, Pa. Feb. 21, 2020).  Mr. Davis appealed the decision to the Board of Immigration Appeals ("BIA") where, with the assistance of counsel, he further developed his claim for derivative U.S. citizenship.  The BIA denied Mr. Davis's appeal on June 10, 2021.  *See* ECF No. 11-4, Dec. and Order of the Bd. of Immigr. Appeals, *In re Davis* (B.I.A. June 10, 2021).

7.    Mr. Davis then timely filed a *pro se* Petition for Review ("PFR") before the U.S. Court of Appeals for the Third Circuit ("Third Circuit") on June 22, 2021.  *See* ECF No. 11-5,

Docket Summary, *Davis v. Att'y Gen. of the U.S.*, No. 21-2235 (3d Cir. *docketed* June 22, 2021) (last accessed Aug. 1, 2022). On December 30, 2021, the Third Circuit issued an order to appoint Mr. Davis counsel, to have the matter re-briefed, and to stay Mr. Davis's removal from the country. Order, ECF No. 34, *Davis v. Att'y Gen. of the U.S.*, No. 21-2235 (3d Cir. Dec. 30, 2021). Mr. Davis did not object to the appointment of counsel and currently awaits for counsel to be appointed.

8.     Before the immigration agency and the Third Circuit, Mr. Davis argues that under Jamaican law—namely the Property (Rights of Spouses) Act of 2004 ("Property Act") [annexed at ECF No. 11-6]—his parents had a legally recognized relationship as "spouses" and thus a "legally" recognized marriage and separation.[1] Owing to the Property Act's retroactivity,[2] Mr. Davis contends the law's application to his parents meant his father and mother were legally married while residing together in Jamaica and then legally separated when Mr. Davis's father came to the United States. Based on his father's legal separation from his mother and subsequent naturalization as a U.S. citizen, Mr. Davis asserts he derived U.S. citizenship from his father under the former 8 U.S.C. § 1432(a)(3).[3]

---

[1] The Property Act provides that "a single man who has cohabited with a single woman as if he were in law her husband for a period of not less than five years[]" is recognized as the legal spouse of that woman. Property (Rights of Spouses) Act, pt. 1, § 2(1) (Act No. 4/2004) (Jam.).

[2] A core contention in Mr. Davis's citizenship claim is whether the Property Act has retroactive application. In *Thompson v. Lynch*, the U.S. Court of Appeals for the First Circuit ("First Circuit") assessed the Property Law and could not identify any evidence the law applied retroactively. 808 F.3d 939, 941 (1st Cir. 2015). In his proceedings before the agency, however, Mr. Davis cited to the Jamaican Supreme Court case, *Brown (Annette) v. Brown (Orphiel)*, Sup. Ct. Civ. App. No. 12/2009 (Jam.) [annexed at ECF No. 11-7], which held the Property Law did apply retroactively. The *Brown* case was not identified or discussed in the First Circuit's *Thompson* opinion.

[3] Enacted in 1952 and repealed in 2000, the former 8 U.S.C. § 1432(a) provided:

A child born outside of the United States to alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
(1) The naturalization of both parents; or

9.      In addition to the argument Mr. Davis derived citizenship from his father under 8

U.S.C. § 1432(a)(3) due to his parents' legal marriage and separation, Mr. Davis also possesses an

as-applied constitutional challenge to 8 U.S.C. § 1432(a)(3).  The provision provides that for

children born out of wedlock—such as Mr. Davis if his parents are deemed never to have legally

married under Jamaican law—mothers may transmit citizenship to their sons but not fathers.  In

*Tineo v. Att'y Gen., United States of Am.*, the Third Circuit—the circuit court which maintains

geographical jurisdiction over Mr. Davis's removal proceedings—determined 8 U.S.C. § 1432(a)

was unconstitutional as applied to a petitioner and his father because it discriminately prevented

the petitioner's father from ever transmitting U.S. citizenship to the petitioner.  *See* 937 F.3d 200,

213-15 (3d Cir. 2019).  The Third Circuit decided the proper remedy was to extend U.S. citizenship

to the petitioner.  *See id*. at 218.

10.      Mr. Davis's claim for citizenship is, as exhibited by the Third Circuit's order

appointing him counsel and staying his removal, substantial and involves nonfrivolous factual and

legal questions.  *Cf. Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting that stay applications are

---

(2) The naturalization of the surviving parent if one of the parents is
    deceased; or
(3) The naturalization of the parent having legal custody of the child
    when there has been a legal separation of the parents or the
    naturalization of the mother if the child was born out of wedlock and
    the paternity of the child has not been established by legitimation;
    and if
(4) Such naturalization takes place while such child is under the age of
    eighteen years; and
(5) Such child is residing in the United States pursuant to a lawful
    admission for permanent residence at the time of the naturalization
    of the parent last naturalized under clause (1) of this subsection, or
    the parent naturalized under clause (2) or (3) of this subsection, or
    thereafter begins to reside permanently in the United States while
    under the age of eighteen years.

8 U.S.C. § 1432 (West).

adjudicated under a four-part test, with the two most important factors being "whether the stay applicant has made a strong showing that he is likely to succeed on the merits[]" and "whether the applicant will be irreparably injured absent a stay[.]").  Framed by his viable claim to U.S. citizenship, Mr. Davis challenges the constitutionality of the mandatory immigration detention statute as applied to him.[4]

11.    Collectively, Mr. Davis's continued detention as an individual with a nonfrivolous claim for U.S. citizenship and following an arrest by ICE without notice and warning at the time of a probation home visit raises serious due process concerns.  Under the three-part *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), test, Mr. Davis warrants additional process because the private interest at hand—"the interest in being free from imprisonment[,]" *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (internal citation omitted)—is perhaps the most important interest there is and Mr. Davis faces an acute risk of an erroneous deprivation of those core rights.

12.    To remedy this infringement on his constitutional rights, Mr. Davis respectfully requests the Court to order ICE to either immediately release him from its custody or, in line with procedural due process norms, afford him an individualized hearing before this Court to review whether his continued detention is justified.  Such a hearing should examine both whether Mr. Davis's claim for U.S. citizenship is substantial and whether the government continues to possess

---

[4] Upon information and belief, Mr. Davis has appeared for custody hearings before an Immigration Judge on two occasions: once around March 2020 and once around April 2022.  The March 2020 hearing was provided to Mr. Davis on the Immigration Judge's own volition after Mr. Davis had filed a *pro se* motion for a change of venue before the court.  Undersigned counsel believes Mr. Davis was denied his release from immigration custody at this hearing on the basis he was subject to mandatory detention under 8 U.S.C. § 1226(c).  Accordingly, this hearing does not impact the evaluation of whether Mr. Davis is due additional process at this juncture.  The April 2022 hearing was provided to Mr. Davis pursuant to the Third Circuit's previously-applicable, but now vacated, precedent, *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 224 (3d Cir. 2018), which afforded noncitizens detained under 8 U.S.C. § 1231 a custody redetermination hearing after six months of removal order detention.

a valid interest—*i.e.*, to prevent danger to the community or ensure participation at future immigration proceedings, *see Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)—in Mr. Davis's continued civil detention. This Court would be best placed to conduct such a hearing as, under 8 U.S.C. § 1252(b)(5)(B), district courts are the preferred venue for addressing "genuine issue[s] of material fact" about a petitioner's claim for U.S. nationality and, additionally, Mr. Davis's claim for citizenship raises constitutional issues, something the immigration agency lacks jurisdiction of addressing, *see United States v. Gonzalez-Roque*, 301 F,.3d 39, 48 (2d Cir. 2002) ("[T]he BIA does not have jurisdiction to adjudicate constitutional issues.").

## PARTIES

13.    Petitioner Damion G.V. Davis is a forty-four-year-old man who Respondents allege is a noncitizen and who is currently detained by Respondents at the Buffalo FDF in Batavia, New York. Petitioner has been detained by Respondents since October 17, 2019, following an immigration arrest Respondents' agents carried out without any notice or warning at Petitioner's home in Carlisle, Pennsylvania. At the time of Petitioner's arrest and detention by ICE, Petitioner had not been charged with removal from this country. Petitioner challenged his removability from the country before the immigration agency and currently has a PFR pending before the Third Circuit. On December 30, 2021, the Third Circuit issued an order staying Petitioner's removal from the United States and appointing Petitioner counsel to assist with litigation of the issues in his case.

14.    Respondent Merrick Garland is sued in his official capacity as the Attorney General of the United States. As the head of the U.S. Department of Justice, Attorney General Garland oversees the operation of the Executive Office of Immigration Review, which encompasses the immigration courts and the Board of Immigration Appeals.

15.     Respondent Alejandro Mayorkas is sued in his official capacity as the Secretary of the U.S. Department of Homeland Security, the agency responsible for Petitioner's immigration arrest and continued detention.

16.     Respondent Thomas Brophy is sued in his official capacity as the Acting Field Office Director of the Buffalo Field Office of Enforcement and Removal Operations, Immigration and Customs Enforcement, U.S. Department of Homeland Security, the local office that determines whether Petitioner is to remain in immigration custody.

17.     Respondent Jeffrey Searls is sued in his official capacity as the Officer-in-Charge of the Buffalo FDF, the facility at which Petitioner is currently detained.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction under the U.S. Constitution. U.S. Const. art I. § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

19.     This Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); and 28 U.S.C. § 1651 (All Writs Act).

20.      Additionally, this Court has jurisdiction to grant injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

21.     Federal district courts have jurisdiction to hear habeas corpus claims raised by individuals challenging their detention by ICE. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Zadvydas*, 533 U.S. at 687; *see also Ranchinskiy v. Barr*, 427 F. Supp. 3d 789, 800 (W.D.N.Y. 2019) ("It is well established within this Circuit that when a court determines the length of a petitioner's detention pursuant to § 1226(c) is unjustified, due process requires that he be given a

bond hearing where an individualized determination can be made as to whether he should remain confined for the duration of his immigration proceedings.").

22.     Venue is proper in the U.S. District Court for the Western District of New York ("Western District") under 28 U.S.C. § 1391 because Mr. Davis is currently detained within this geographical jurisdiction of the Western District.

## EXHAUSTION OF REMEDIES

23.     No statutory exhaustion requirement exists for petitions challenging immigration detention under 28 U.S.C. § 1226(c). *See Abdi v. Nielsen*, 287 F. Supp. 3d 327, 341 (W.D.N.Y. 2018); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 538 (S.D.N.Y. 2014) ("There is no statutory requirement that a habeas petitioner exhaust his administrative remedies before challenging his immigration detention.").

24.     Further, exhaustions of remedy on a citizenship claim is not required because the exhaustion requirement of the Immigration and Nationality Act ("INA") only governs noncitizens. *See Poole v. Mukasey*, 522 F.3d 259, 264 (2d Cir. 2008) ("The statutory administrative exhaustion requirement of [8 U.S.C.] § 1252(d)(1) does not apply to a person with a non-frivolous claim to U.S. citizenship."); *Flores-Torres v. Mukasey*, 548 F.3d 708, 712 (9th Cir. 2008) ("A nationality claim need not be exhausted because only an 'alien' is required to exhaust administrative remedies under the INA.").

25.     Mr. Davis should thus not be required to pursue administrative remedies since no adequate mechanisms before the immigration agency exist. *See* 8 U.S.C. § 1226(c); *see also Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 249 (2d Cir. 2008) ("The exhaustion requirement is excused when exhaustion would be futile because the administrative procedures do not provide an adequate remedy.").

## RELEVANT FACTS AND PROCEDURAL HISTORY

26.    Mr. Davis has resided in the United States since his lawful entry as a LPR on November 2, 1989—nearly thirty-three years ago.  He has been detained in the custody of ICE continuously since his unnoticed arrest and detention at his home in Carlisle, Pennsylvania on October 17, 2019.  As of the date of this Amended Petition, Mr. Davis has been detained for 1,019 days, a period of over thirty-three months.  Mr. Davis possesses a substantial and nonfrivolous claim to U.S. citizenship and is currently litigating the issue before the Third Circuit.  On December 30, 2021, the Third Circuit issued an order appointing Mr. Davis counsel and staying his removal.

27.    During the entirety of his ICE detention, Mr. Davis received two custody hearings before the immigration court: once in or about around March 2020, and the other on April 6, 2022, pursuant to *Guerrero-Sanchez*, 905 F.3d at 224.  Mr. Davis was denied release by the immigration judge who held the *Guerrero-Sanchez* bond hearing and he currently has a pending appeal of that decision.  However, upon information and belief, that appeal will not proceed given the recent decision by the Supreme Court in *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827 (2022), which rejected the statutory argument upon which *Guerrero-Sanchez* was decided.  In rejecting the statutory argument, the Supreme Court did, however, make clear that it was not reaching the constitutional challenge that was raised by the noncitizen, explaining that "[t]he courts below did not reach Arteaga-Martinez's constitutional claims because they agreed with him that the statute required a bond hearing.  We leave them for the lower courts to consider in the first instance." *Id.* at 135.

### *Mr. Davis's Entry into the United States, Early Years, and Family*

28.     Mr. Davis lived in New York City after being lawfully admitted into the United States as an LPR.   He entered the United States with his mother, two brothers, and little sister. Mr. Davis's father had immigrated first to the United States and was already living in New York. Mr. Davis went to live with his father and aunt in Staten Island soon after he arrived in New York. While Mr. Davis would visit and spend time at his mother's residence, his primary residence was with his father in Staten Island.  Mr. Davis attended school in New York, including at the New Dorp High School in Staten Island.

29.     On November 23, 1994, Mr. Davis's father became a naturalized United States citizen.  At that time, Mr. Davis was fifteen years old and in his father's legal and physical custody.

30.     At the age of twenty-one, Mr. Davis left home to pursue a career in music.  He eventually settled down in Carlisle, Pennsylvania.  On November 6, 2008, Mr. Davis married his first wife, Amy Cary Cox.  They had four children together: Chinna Hilda Davis (now age 23), Zayeara Alexus Davis (now age 21), Jahil Clarence James Davis (now age 18), and K-G-D-D- (now age 12).[5]  Mr. Davis's daughter, Chinna, has a son, making Mr. Davis a grandfather.  Mr. Davis and his wife Amy remained together for sixteen years before separating.

31.     On November 12, 2016, Mr. Davis married his second and current wife, Ashley Dawn Davis.  Mr. Davis's wife had two children from a prior relationship and they further had two children together.  Mr. Davis's first child with Ashley, M-D-D-, died on March 2, 2017.  *See* ECF No. 11-8, Cert. of Fetal Death of M-D-D-.

---

[5] The names of all minor children referenced in this Amended Petition have been redacted in accordance with Fed. R. Civ. P. 5.2(a)(3).

### *Immigration Arrest, Removal Proceedings, and Detention*

32.     On October 17, 2019, Mr. Davis was arrested at his home in Carlisle, Pennsylvania, by ICE.  *See* ECF No. 11-1, Davis Decl. ¶ 2.  The arrest occurred at approximately 7:30 AM local time.  *See id*.  Mr. Davis surmises the ICE arrest occurred after a tipoff from his longtime parole officer, Chris.  *See id*. ¶ 3.  Mr. Davis believes that to be the case because a week prior to his immigration arrest, Chris had conducted a "'regular'" parole visit at Mr. Davis's home, during which Chris asked Mr. Davis to withdraw or dismiss a lawsuit Mr. Davis filed against a police officer for excessive force.  *Id*. ¶ 4.  The lawsuit stemmed for an incident that led to the death of Mr. Davis's daughter, M-D-D-.  *See id*.

33.     During the immigration arrest, ICE officers showed up at Mr. Davis's house and entered without providing a warrant.  *See id*. ¶¶ 5-6.  Officers also did not show Mr. Davis any paperwork relating to any charges of removal.  *See id*. ¶ 6.

34.     After being arrested, Mr. Davis was eventually brought to and detained by ICE at the York CP.  *See id*. ¶ 8.  On October 23, 2019, six days after he was arrested, Officer MacPherson visited Mr. Davis and conducted an immigration interview.  *See id*. ¶ 9.  Officer MacPherson visited Mr. Davis again on October 24, 2019, and conducted a similar interview.  *See id*. ¶ 10. Officer MacPherson did not provide Mr. Davis with any advisals, read him any rights, or convey to him the purpose of the interviews other than that Mr. Davis "'was removable'" from the country. *See id*. ¶¶ 9-12.

35.     On the evening of October 24, 2019, a different ICE officer visited Mr. Davis and gave him a NTA, thereby initiating removal proceedings against Mr. Davis.  *See id*. ¶ 13.  The NTA was dated for October 17, 2019, the date Mr. Davis was arrested.  *See id*.

36.     In his immigration proceedings, Mr. Davis had his first master calendar hearing on November 19, 2019, and had a final hearing before the Immigration Judge on February 5, 2020. On February 5, 2020, the Immigration Judge ordered Mr. Davis removed.  The Immigration Judge denied Mr. Davis's derivative U.S. citizenship claim and his application for protection under the United Nations Convention Against Torture.  *See* ECF No. 11-3, Dec. and Orders of the Immigr. Judge, *In re Davis* (Immigr. Ct., York, Pa. Feb. 21, 2020).

37.     Mr. Davis filed a timely appeal to the BIA.   The BIA denied Mr. Davis's appeal on June 10, 2021.  *See* ECF No. 11-4, Dec. and Order of the Bd. of Immigr. Appeals, *In re Davis* (B.I.A. June 10, 2021).  Mr. Davis thereafter filed a timely PFR with the Third Circuit.  *See* ECF No. 11-5, Docket Summary, *Davis v. Att'y Gen. of the U.S.*, No. 21-2235 (3d Cir. *docketed* June 22, 2021) (last accessed Aug. 1, 2022).  The Third Circuit—after initially denying a stay of removal—entered an order on December 30, 2021, staying Mr. Davis's removal pending adjudication of the PFR and ordered the appointment of counsel.  *See id.*

38.     On June 9, 2022, Mr. Davis filed a *pro se* habeas petition before this Court.  *See* ECF No. 1.  On July 10, 2022, undersigned counsel agreed to represent Mr. Davis in his habeas petition and the parties agreed to a schedule of submissions to the Court.  *See* ECF Nos. 4, 5, 6, 7. On July 25, 2022, Mr. David requested and the Court granted an extension of deadlines for the parties' filings.  *See* ECF Nos. 9, 10.

## LEGAL FRAMEWORK

### *Detention of Individuals with Nonfrivolous Claims for U.S. Citizenship*

39.     The Non-Detention Act states, "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."  18 U.S.C. § 4001(a); *see also Ng Fung Ho v. White,* 259 U.S. 276, 284 (1922) (stating that an assertion of U.S. citizenship

"is thus a denial of an essential jurisdictional fact" in removal proceedings).  For these reasons, ICE's detention of an individual with a nonfrivolous claim to U.S. citizenship raises a threshold and serious due process concern.

40.    Here, Mr. Davis possesses two nonfrivolous and substantial claims for U.S. citizenship.  First, Mr. Davis asserts he derived citizenship through his father under the former 8 U.S.C. § 1432(a)(3) because his parents legally married and separated through application of the Jamaica Property Law.  The law's retroactive application meant that after Mr. Davis's father and mother had cohabitated in Jamaica for a period exceeding five years, they were treated as legal spouses under Jamaican law.  Once Mr. Davis's parents ceased their cohabitation when Mr. Davis's father immigrated to the United States, Mr. Davis's parents were legally separated.  Since Mr. Davis's father later naturalized while Mr. Davis was under the age of sixteen and within his father's legal and physical custody in Staten Island, Mr. Davis derived citizenship through his father under for the former 8 U.S.C. § 1432(a)(3).

41.    Second, and assuming Mr. Davis's parents were never legally married, Mr. Davis possesses an as-applied constitutional challenge to the former 8 U.S.C. § 1432(a)(3), which prevented him, as a child born out of wedlock, from ever deriving citizenship from this father.  In *Tineo*, the Third Circuit determined the provision violated the Equal Protection Clause of the Fifth Amendment because it discriminated against unwed fathers.  *See* 937 F.3d at 213-15.  As applied to Mr. Davis, the former 8 U.S.C. § 1432(a)(3) is similarly unconstitutional as applied to Mr. Davis's father because it prevented him from transmitting U.S. citizenship to Mr. Davis without forcing Mr. Davis to take the substantive and invasive step of formally marrying Mr. Davis's mother.

*Improper Immigration Searches and Seizures under the Fourth Amendment*

42.     The Fourth Amendment of the U.S. Constitution requires agents to have probable cause to arrest an individual.  *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).  While the INA purports to authorize the arrest of a person on immigration charges where the arresting agent has "reason to believe that the [person] so arrested is in the United States in violation of any such law or regulation[,]" 8 U.S.C. § 1357(a)(2), such arrests must be preceded by probable cause for a suspected immigration violation, *see United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975) (holding that, in the immigration context, after a *Terry* stop "any further detention or search must be based on consent or probable cause."); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that a warrantless search of a car by immigration agents requires probable cause).

43.     In order to avoid conflicting with the dictates of the Fourth Amendment, courts, including the Court of Appeals for the Second Circuit, have universally interpreted the INA's "reason to believe" language as equivalent to probable cause.  *See Ojeda-Vinales v. Immigr. & Naturalization Serv.*, 523 F.2d 286, 288 (2d Cir. 1975); *see also, e.g.*, *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *Babula v. I.N.S.*, 665 F.2d 293, 298 (3d Cir. 1981); *Tejeda-Mata v. I.N.S.*, 626 F.2d 721, 725 (9th Cir. 1980); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975), *cert. denied*, 423 U.S. 1035 (1975); *Au Yi Lau v. I.N.S.*, 445 F.2d 217, 222 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 864 (1971).

44.     In Mr. Davis's case, there was no probable cause for his unnoticed arrest by ICE agents on October 17, 2019, at his home.  As is set forth *supra,* Mr. Davis was not arrested and detained by ICE at the time of his last interaction with the criminal justice system, but rather at his home.  As demonstrated by the timeline of Mr. Davis's arrest and detention by ICE until the issuance of the NTA, ICE did not have any probable cause to arrest Mr. Davis on October 17,

2019.  Rather, ICE arrested and detained Mr. Davis first and then issued an NTA on October 24, 2019, seven days after Mr. Davis's unnoticed arrest and detention.

45.      Since ICE did not demonstrate its possession of a valid arrest warrant or paperwork showing there was probable cause to believe Mr. Davis was not a national of the United States at the time of his arrest, its initial arrest of Mr. Davis violates the Fourth Amendment.

### *Procedural Due Process Norms Required for Extended Civil Immigration Detention*

46.      The Supreme Court has repeatedly held that civil commitment is unconstitutional if it becomes unreasonable in relation to its purpose.  *See e.g.*, *Zadvydas*, 533 U.S. at 695.  In *Zadvydas,* the Supreme Court emphasized, "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects."  *Id*. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  The Court noted, "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem."  *Id*.

47.      Due process demands "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint."  *Id*.  This is especially apparent in civil detention settings.  *See Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purposes constitutes a significant deprivation of liberty that requires due process protection.")  (internal citations omitted).

48.      In the immigration context, the Supreme Court has authorized only two governmental purposes for detention: (1) to mitigate the risks of danger to the community, and (2) to prevent flight.  *See Kim*, 538 U.S. at 531 (Kennedy, J., concurring) ("[T]he justification for 8 U.S.C. § 1226(c) is based upon the Government's concerns over the risk of flight and danger to the community.").  Both justifications must be carefully scrutinized to ensure that continued detention

is necessary to achieve those aims. *See Zadvydas*, 533 U.S. at 690 ("[W]here detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed.") (internal citation, quotation marks, and alterations omitted); *Kim*, 538 U.S. at 532 ("[S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.").

49.     The Court has further limited the imposition of potentially indefinite detention to rare circumstances involving the "most serious of crimes." *Zadvydas*, 533 U.S. at 691; *see also id*. ("In cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger.") (internal citation omitted) (emphasis in original).

50.     Following the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), which struck down bright-line six-month rules for the provision of custody hearings to individuals detained under 8 U.S.C. § 1226(c),[6] judges in this Circuit have generally adopted a multi-factor test to assess, on a case-by-case basis, whether detention has become unjustified or unreasonable. *See, e.g.*, *Alvarado v. Garland*, No. 21-CV-1293-LJV, 2022 WL 2187263, at *3

---

[6] In his *pro se* petition, Mr. Davis indicated his belief he was detained by Respondents under Respondents' 8 U.S.C. § 1231 detention authority. *See generally*, ECF No. 1. However, upon review with undersigned counsel, Mr. Davis now expresses his view that his current detention is authorized by 8 U.S.C. § 1226(c) because the Third Circuit has granted a formal stay of removal in his PFR. *See* Order, ECF No. 34, *Davis v. Att'y Gen. of the U.S.*, No. 21-2235 (3d Cir. Dec. 30, 2021); *see also Hechavarria v. Sessions*, 891 F.3d 49, 55 (2d Cir. 2018) (finding that an individual who has an active PFR before a circuit court and who has been granted a stay of removal by that circuit court is detained under 8 U.S.C. § 1226).

(W.D.N.Y. June 17, 2022).  Such factors include "'(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal.'"  *Id.*  (quoting *Hemans v. Searls*, No. 18-CV-1154-LJV, 2019 WL 955353, at *6 (W.D.N.Y. Feb. 27, 2019)).[7]

51.    Here, Mr. Davis has, as of the date of this filing, been detained by ICE for over thirty-three months during the pendency of his removal proceedings.  While Mr. Davis received a custody hearing in April 2022 pursuant to the Third Circuit's *Guerrero-Sanchez* decision, that hearing does not dispel the need to ensure Mr. Davis's ongoing detention continues to serve a valid government interest.  Additionally, Mr. Davis's detention is expected to continue for a notable period of time.  His PFR before the Third Circuit remains at an early stage as the court has issued an order appointing him counsel and for re-briefing of the case but such events have yet to occur.

52.    Further, given that Mr. Davis has presented a nonfrivolous claim to U.S. citizenship—and the concurrent gravity of the liberty deprivation that befalls a prospective U.S. citizen—the likelihood Mr. Davis's removal proceedings will result in a final order of removal is strained and diminished.

53.    Moreover, the Second Circuit has recently suggested that the proper lens to assess the constitutionality of continued immigration is through the Supreme Court's test from *Mathews*, 424 U.S.  *See Velasco Lopez*, 978 F.3d at 851 (noting the dispositive issue on appeal was whether

---

[7] Judges in this Circuit have also commonly examined immigration habeas petitions under a seven-factor test.  In *Gordon v. Garland*, for example, the district judge considered: "(1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion."  No. 21-CV-6569-EAW, at *3 (W.D.N.Y. July 6, 2022) (citing *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018)).

the noncitizen petitioner's "ongoing incarceration posed due process concerns at the time of his habeas filing" and indicating the analysis should be performed "under the three-factor test as provided in *Mathews* . . . ."). That test encompasses: "(1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

54.     Here, the *Mathews* test overwhelmingly weighs in Mr. Davis's favor. First, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment . . . lies at the heart of [] liberty.").

55.     Second, the risk of an erroneous deprivation of Mr. Davis's liberty interests is particularly acute because of his substantial claim for U.S. citizenship. While that claim is currently being litigated before the Third Circuit, ICE's detention of an individual with a nonfrivolous claim to U.S. citizenship raises the heightened concerned they may be erroneously detaining a U.S. citizen that cannot be otherwise subjected to immigration detention. *See Poole*, 522 F.3d at 264 ("'Until the claim of citizenship is resolved, the propriety of the entire proceeding is in doubt.'") (quoting *Frank v. Rogers*, 253 F.2d 889, 890 (D.C. Cir. 1958)).

56.     Given the high stakes involved, the Ninth Circuit has held that federal district courts have habeas jurisdiction to adjudicate whether federal immigration officials unlawfully detained an individual with a nonfrivolous claim to United States citizenship. *See Flores-Torres v.*

*Mukasey*, 548 F.3d 708, 713 (9th Cir. 2008); *see also Iasu v. Smith*, 511 F.3d 881, 891 (9th Cir. 2007) ("[A] non-frivolous claim to U.S. citizenship gives a person a constitutional right to judicial review . . . .")  (internal quotation marks omitted).

57.     The third *Mathews* factor, the government's interest in the procedures proposed and the attendant burdens, further weighs in Mr. Davis's favor. The proposed procedure—requiring that the government prove that his continued detention is justified—does not meaningfully prejudice the government's interest.  *See e.g.*, *Hechavarria v. Sessions*, No. 15-CV-1058-LJV, 2018 WL 5776421, at *8 (W.D.N.Y. Nov. 2, 2018) ("But [the government's interests] are the very interests that would be addressed at a detention hearing.  So the government's continued assertion that [the petitioner] must be detained because he is dangerous simply begs the question and suggests exactly why a hearing is necessary.")  (internal citations omitted).

58.     Moreover and as discussed *supra,* Mr. Davis was arrested by immigration officials at his home while he was on probation for a previous criminal event.  Mr. Davis was already found not to be a danger to the community and a flight risk when he was granted probation in criminal proceedings and there had been no evidence Mr. Davis had ever violated the conditions of his parole.

59.     In sum, Mr. Davis has presented a meritorious and nonfrivolous claim for U.S. citizenship.  Mr. Davis has lived in the United States continuously since the age of eleven and his current threat of removal from the United States would forcibly separate him from his wife and children, all of whom are United States citizens.  Absent an impartial review of his continued detention, Mr. Davis will continue to be detained without any avenue to challenge a unilateral decision by ICE to arrest and detain him, despite the absence of any probable cause to do so on October 17, 2019.

## CLAIMS FOR RELIEF

### COUNT ONE:

**MR. DAVIS POSSESSES A NONFRIVOLOUS AND SUBSTANTIAL CLAIM TO U.S. CITIZENSHIP, RENDERING HIS ONGOING DETENTION VIOLATIVE OF THE NON-DETENTION ACT AND HIS DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION**

60.     Mr. Davis re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

61.     ICE's detention of an individual with a nonfrivolous claim to U.S. citizenship raises serious due process concerns.  *See Poole*, 522 F.3d at 264 ("'Until the claim of citizenship is resolved, the propriety of the entire proceeding is in doubt.'")  (quoting *Frank*, 253 F.2d at 890).

62.     Mr. Davis has a nonfrivolous claim to U.S. citizenship because under the Jamaican Property Law, his parents were legally married and legally separated after they had cohabitated a home in Jamaica for a period exceeding five years.  Mr. Davis would then have derived U.S. citizenship through the former 8 U.S.C. § 1432(a)(3) because he was a LPR, under the age of eighteen, and in his father's legal and physical custody when his father naturalized.

63.     Furthermore, assuming Mr. Davis's parents were never legally married, Mr. Davis possesses an independent claim for derivative U.S. citizenship based on an as-applied challenge to the constitutionality of former 8 U.S.C. § 1432(a)(3).  In *Tineo*, the Third Circuit found the provision unconstitutional because it prevented a father to ever practically transmit citizenship to his born-out-of-wedlock child.  *See* 937 F.3d at 213-15.

64.     Should Mr. Davis have derived U.S. citizenship, his ongoing detention by ICE categorically violates the Non-Detention Act.  At the very least, Mr. Davis's nonfrivolous claim to U.S. citizenship raises the serious constitutional concerns of Respondents improperly detaining a U.S. citizen in immigration detention.

21

## COUNT TWO:

### MR. DAVIS'S ARREST AND DETENTION BY ICE ON OCTOBER 17, 2019 CONSTITUTES AN UNREASONABLE SEIZURE AND THUS VIOLATES THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION.

65.   Mr. Davis re-alleges and incorporates by reference each and every allegation set forth in the proceeding paragraphs.

66.   To comply with the Fourth Amendment's prohibition against unreasonable seizures, an arresting immigration officer must have probable cause an individual has violated an immigration law before executing an arrest. *See Brignoni-Ponce*, 422 U.S. at 881-82.

67.   ICE officers conducted an unannounced and unnoticed arrest of Mr. Davis at his home in Carlisle, Pennsylvania, on October 17, 2019.  Since ICE officers did not produce any appropriate documentation that would form valid bases for their arrest of Mr. Davis, their seizure of him was unreasonable and violates the Fourth Amendment.

## COUNT THREE:

### MR. DAVIS'S ONGOING DETENTION VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION.

68.   Mr. Davis re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

69.   It has long been held that civil detention must be carefully limited to avoid due process concerns. *See Salerno*, 481 U.S. at 755 ("[L]iberty is the norm, and detention prior to trial or without trial is the carefully limited exception").  Civil commitment is constitutional only when there are "proper procedures and evidentiary standards," including individualized findings of dangerousness or flight risk. *Kansas v. Hendricks*, 521 U.S. 346, 357-58 (1997).

70.   Under the test proscribed in *Mathews*, 424 U.S., additional procedural process is warranted when an individual's private interest is at a heightened risk of erroneous deprivation.

Mr. Davis warrants additional process because his lengthy and ongoing detention, particularly as an individual with a nonfrivolous claim to U.S. citizenship, raises serious risks of an erroneous deprivation of his core interests to be free from improper detention.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis respectfully prays that this Court grant the following relief:

1.      Assume jurisdiction over this matter; and

2.      Grant a Writ of Habeas Corpus directing Respondents to release him from further unlawful detention; and

3.      In the alternative, issue a conditional writ of habeas corpus requiring Respondents to provide him with an individualized bond hearing before a neutral arbiter (this Court or, in the alternative, an Immigration Judge) at which Respondents (or his agents) must bear the burden of establishing by clear and convincing evidence that his continued detention is justified; and

4.      Order that in considering his detention, Respondents must consider alternatives to detention and his ability to pay when setting monetary bond; and

5.      Award Petitioner his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6.      Grant such further relief as the Court deems just and proper.

//

//

//

//

//

//

Respectfully submitted,

DATED: Aug. 1, 2022          */s/ John Peng*
Albany, New York             John Peng, Esq.
                             Federal Litigation & Appellate Staff Attorney
                             Immigration Unit
                             Prisoners' Legal Services of New York
                             41 State St., Ste. M112
                             Albany, NY 12207
                             (518) 694-8699 ext. 2102
                             jpeng@plsny.org

DATED: Aug. 1, 2022          */s/ Sarah Gillman*
New York, New York           Sarah Gillman, Esq.
                             Legal Director
                             Rapid Defense Network
                             11 Broadway, Ste. 615
                             New York, NY 10004
                             (212) 843-0910
                             sarah@defensenetwork.org

                             *Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>August 1, 2022</u>, I filed this <u>Amended Petition for Writ of Habeas Corpus</u> with supporting papers with the Clerk of the District Court using the Court's CM/ECF system.  By local rule, this petition and the supporting papers will be electronically served through the Court's CM/ECF system on the Respondent in this case.

//

DATED:   Aug. 1, 2022
           Albany, New York

<div style="margin-left:40%">

*/s/ John Peng*
John Peng, Esq.
Prisoners' Legal Services of New York

</div>